AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

xxxx xx<sup>th</sup> Street, NW
Washington, DC , 20011

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT
CASE NUMBER:

(Further described below)

I ____Pedro Tavares_____being duly sworn depose and say:

I am a(n)___Special Agent with the United States Secret Service___ and have reason to believe
_____(Official Title)_____
that ☐ on the person of or ☒ on the property or premises known as   (name, description and or location)

**The location at xxxx xx<sup>th</sup> Street, NW, and the Corner of Allison Street, NW, Washington, DC, is more fully described as a two story brown row house.  The entrance to xxxx xx<sup>th</sup> Street is located on the Western side. The front porch is constructed of concrete and brick staircase that runs across the front of the building providing access to the street with two numbers "xxxx'' affixed to the left entryway column, clearly visible from the street.  The entry is separated by a iron decorated storm door.**

**Included in the search for the items described is a shed attached to the Southwestern side of the home and a dog house located in the backyard**.

concerning a violation of Title _18_ United States Code, Section(s)_§_1344. The facts to support a finding of
Probable Cause are as follows:

**SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN**

Continued on the attached sheet and made a part hereof.    ☒ YES   ☐ NO

DAVID SAYBOLT
Federal Major Crimes Section
(202) 307-6080

Signature of Affiant
Pedro Tavares, Special Agent
United States Secret Service

Sworn to before me, and subscribed in my presence

_____
Date

at Washington, D.C.

_____
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## APPLICATION AND AFFIDAVIT IN SUPPORT OF SEARCH WARRANT FOR:

### xxxx xx<sup>th</sup> Street, NW, Washington, D.C. 20011

I, Special Agent Pedro Tavares, being duly sworn, depose and state as follows:

**I.      Introduction**

1.      I am a Special Agent (hereafter "SA") with the United States Secret Service (hereafter "USSS") and have been employed by the USSS since May 29, 2007. I am and have been assigned to the Washington Field Office. Prior to that, I was employed for five years as a United States Probation Officer for the United States District Court for the District of Columbia.  I have received formal training in the investigation of financial crimes, including access device fraud, the counterfeiting of United States monetary obligations and securities, and identity theft.  I was formally trained as a Criminal Investigator at the Federal Law Enforcement Training Center in Glynco, Georgia, and as a Special Agent at the USSS's James J. Rowley Training Center in Beltsville, Maryland. During my tenure, I have participated in cases involving check fraud, the counterfeiting of United States monetary obligations and securities, access device fraud, identity theft, and bank fraud**.**

2.      The information contained in this affidavit is based on: (1) my personal knowledge and observations made by me during the course of this investigation; (2) information conveyed to me by other law enforcement officials, financial institution personnel, and other witnesses; (3) my review of other evidence obtained during the investigation.  Since this affidavit is submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact I know regarding this investigation.

3.      This affidavit contains information necessary to support probable cause for a search warrant of xxxx xxth Street, NW, Washington, D.C. 20011 ("xxxx xx<sup>th</sup>"), as described in Attachment A, charging that the residents of this row house, Reina Elizabeth Arevalo and Lamont Xavier Smith, are involved in an ongoing scheme to defraud individuals and institutions in violation of 18 U.S.C. § 1344 (bank fraud).

4.      Furthermore, there is probable cause to believe that evidence, fruits and

instrumentalities of these offenses (as described in Attachment B) will be found at xxxx xxth Street, NW, Washington, D.C. 20011, inside the 2002 silver Mercedes Benz vehicle (Vehicle Identification Number: xxxxxxxxxxxxxxxxxx, Maryland license plate number xxxxxxx), or stored on a personal computer.

## II. Background

  5.  Title 18, United States Code, Section 1344, provides in pertinent part:

    Whoever, knowingly executes, or attempts to execute, a scheme or artifice – (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises . . .

has committed bank fraud, a felony under federal law.

## III  Details of Probable Cause for Search Warrant

  6.  On February 28, 2008, the U.S.S.S. Metro Area Fraud Task Force assisted Hyattsville, Maryland, Police Department Detective James Denault, with execution of an arrest warrant for Lamont Xavier Smith and a search warrant on his residence located at xxxx xxth Avenue, Hyattsville, Maryland. The suspect used fraudulent information to obtain Chevy Chase Bank debit cards and pin numbers associated with bank cards. On February 25, 2008, Detective Denault was contacted by Deserie Comfort of Chevy Chase Bank Security Department. She reported that a male had requested replacement cards in the names of Umesh Agnihotri, Alfides Vasques, Manuel Hernandez, and Ana McCarthy. Between December 7, 2007, and February 23, 2008, all four accounts were compromised.

  7.  Detective Denault's investigation revealed that on December 3, 2007, suspect Smith called the Chevy Chase Bank's Customer Service Care Department and ordered a replacement debit card in the name of Umesh Agnihotri. Surveillance video recorded that Smith used the card to withdraw cash from four ATM's within Prince George's County, Maryland. On December 5, 2007, the account was used to purchase the following: Hyattsville 7-Eleven $1.98 charge; and two check cards purchased at the 7-

2

Eleven in the amount of $2,010.95 and $764.99. On December 6, 2007, a withdrawal in

the amount of $26.94 was made at the Burger King,
located in Colmar, Manor, Maryland.  Mr. Agnihotri advised Chevy Chase Bank that he
did not make the purchases or withdrawals nor did he authorize the issuance or use of the
card. The total loss on his account was $4,804.86.

8.      On December 7, 2007, suspect Smith called the Chevy Chase Bank's
Customer Service Care Department and ordered a replacement debit card in the name of
Alfides Vasquez. On December 12, 2007, he contacted the Customer Service Care
 Department and requested an increase on his withdrawal limit to $800. The following
fraudulent transactions were identified on this account: On December 12, 2007, an
ATM withdrawal in the amount of $800 was made at the Queens Chapel Road,
Hyattsville, Maryland. A video surveillance camera recorded Smith making the
transaction; on December 13, 2007, two ATM withdrawals were made at the Prince
George's Plaza, xxxx Belcrest Road, Hyattsville, Maryland. At 12:05 a.m., $200 was
withdrawn and at 12:06 a.m., $600 was withdrawn from the account; on December 14,
2007, two additional withdrawals were made at the ATM located at xxxx Hamilton
Street, Hyattsville, Maryland, each in the amount of $400. A video surveillance camera
again recorded Smith making these transactions.
Mr. Vasquez advised Chevy Chase Bank that he did not make the purchases or
withdrawals, nor did he authorize the issuance or use of the card. The total loss on his
account was $2,406.50.

9.      On January 8, 2008, an unidentified woman called the Chevy Chase
Bank's Customer Service Care Department. She ordered a replacement debit card in the
name of Ana McCarthy and requested the card be delivered to xxxx xx[th] Avenue,
Hyattsville, Maryland. On January 15, 2008, a woman contacted the Customer Service
Care Department and requested an increase on her withdrawal limit to $800. The
following fraudulent transactions were identified on this account: on January 15,
2008, two ATM withdrawals were made at xxxx Hamilton Road, Hyattsville, Maryland,
each in the amount of $400; on January 17, 2008, four ATM withdrawals were made

3

at the Adams Morgan Bank of America location in Washington, D.C. At 12:01 a.m.,

$280; at 12:02 a.m., $ 280; at 12:03 a.m., $ 200.00; and at 12:05 a.m., $30.00;

On January 18, 2008, two ATM withdrawals in the amount of $400 and $80 were made at the White Flint Mall, Bethesda, Maryland.  Ms. McCarthy advised Chevy Chase Bank that she did not make these purchases or withdrawals, nor did she authorize the issuance or use of the card. The total loss on her account was $2,085.50.

10.     On February 23, 2008, a male called the Chevy Chase Bank's Customer Service Care Department and ordered a replacement debit card in the name of Manuel Hernandez. Chevy Chase Bank Investigator, Desiree Comfort, informed Detective Denault that a male individual contacted the bank requesting delivery of Manuel Hernandez's bank card to xxxx xx[th] Avenue, Hyattsville, Maryland. On February 26, 2008, Denault observed a white FEDEX truck deliver the controlled debit card to the address. He identified Smith as the individual in the bank surveillance recordings and observed him driving a silver Mercedes Benz G500, Maryland license registration number xxxxxxxx.

11.     The search warrant yielded many investigative leads including (1) credit cards belonging to Julio Cruz, Gloria Cruz, Mohammed Pourrabi, Mayflower Cab Company, Ana McCarthy, Xue H. Chen Sr., Kosmos Inc., and Manuell Fernandez, (2) checking account information belonging to Aisha A. Abdelraoof, AntonioValdez, and Gary Gordon, (3) sales information with the identity, social security numbers, dates of birth, and home addresses of customers from United Cars of Arlington, Virginia, the Mobile Solution xxxx East West Highway, Hyattsville, Maryland, and the medical offices of Doctors Vali Asha and Kewalk Sharma, xxxx Georgia Avenue, Silver Spring, Maryland, and (4) 13 Internal Revenue Service W-2's and 12 I.R.S.1040 forms belong to individuals in the states of New York and New Jersey. Additionally, we found Reina Arevalo's personal information, place of residence, mail, and a Maryland Certificate of Title for a 2002 Mercedes Benz Sports Utility Vehicle purchased on January 10, 2008, by Arevalo. During the search, Arevalo was identified by Smith's mother and brother as his "girlfriend."

12.     For over four weeks now, I have been conducting a bank fraud investigation in the Metropolitan Washington, D.C. area on this case. My investigation has revealed that Smith no longer resides at xxxx xx[th] Avenue, Hyattsville, Maryland. He was notified by his mother that Prince George's County Court issued an arrest warrant for his arrest. On March 31, 2008, I observed Smith and Arevalo leaving xxxx xx[th] and driving a silver Mercedes G500, Maryland license registration number xxxxxxxx. The pair returned to the home one hour later. Arevalo is known to reside at this address with her birth family.

13.     All identified victims thus far have been associated with information found in the home of Smith. Information culled from these victims and bank investigators from Bank of America, Chevy Chase Bank, Chase Bank, and Apple Federal Credit Union, led me to identify Reina E. Arevalo, a resident of xxxx xx[th] as a suspect. Arevalo, and co-conspirator Smith, have been opening credit accounts using the victims' social security numbers, names, and dates of birth without their knowledge or permission. From November 2007 to March 2008, accounts were fraudulently accessed by the suspects. Generally, the suspect would contact the bank, change the home and contact information to fraudulent telephone numbers and their home address. They would then request new credit cards to be mailed to the new residence located at xxxx xx[th] Avenue, Hyattsville, Maryland, and xxxx xx[th] Street, NW, Washington, D.C.

14.     On March 5, 2008, I spoke to Apple Federal Credit Union bank investigator, Phil Hannum. He confirmed that Arevalo with a social security number xxx-xx-xxxx, residing at xxxx xx[th], D.C. driver's license # xxxxxx,  opened a bank account with $5 and applied for a car loan in the amount of $30,600. Arevalo used this loan along with a cash deposit in the amount of $9,000 to purchase the 2002 Mercedes Benz G500. An initial payment was made on March 3, 2008, with Bank of America account number xxxxxxxxxxxxxx and routing number xxxxxxxxx in the amount of $610.82.

15.     On March 27, 2008, Chase Bank Card Regional Investigator Dyan Henn, e-mailed this office a spreadsheet with information on the accounts of Julio and Gloria

Cruz, Mohammad H. Pourrabi, and Xue H. Chen Sr. She identified these individuals as

victims whose home addresses were changed to xxxx xx[th] Avenue, Hyattsville, Maryland, and new credit cards were mailed to this address. To date, a total loss of $61,739.61 has been identified by Chase Bank associated with the illegal use of credit by the suspects.

16.    Furthermore, Ms. Henn identified internet applications submitted by Lamont Smith, Mohammed Pourrabi, Johnathan R. Smith, Manuell Hernandez, Jose L Cruz, and Reina Arevalo with similar account information retained by the institution's on-line applications. The following information was used on all the accounts: business telephone number (xxx-xxx-xxxx); home telephone number (xxx-xxx-xxxx); e-mail address (arevaloreina@aol.com); and IP address (208.59.124.13). Due to the banks on-going investigation, all the accounts were declined.

17.    On March 28, 2008, Bank of America Security Account Manager Marcia Rasmussen, faxed this office information pertaining to the accounts held by Mohammed Pourrabi. Mr. Pourrabi has three current accounts, all of which have been compromised. The following is a breakdown of the losses provided by Bank of America with respect to Mr. Pourrabi's accounts: Azin Corporation $12,213.82; Mayflower Cab Company $823.15; and Business Card $3,608. Mr. Pourrabi advised Bank of America that he did not make these purchases or withdrawals, nor did he authorize the issuance or use of the card. The total loss on his account was $16,645.91. Furthermore, all three accounts had a change of address to the residence of Smith at xxxx xx[th] Avenue, Hyattsville.

18.    On April 1, 2008, I spoke to Deserie Comfort from Chevy Chase Bank. She disclosed that on March 21, 2008, bank security received an affidavit from Haimanot Gedamu (account number xxx-xxxxxx-x/card number xxxx xxxx xxxx xxxx) claiming four unauthorized ATM withdrawals and eight unauthorized check card transactions totaling $2,271.13 had been made from his account. An internal bank investigation revealed that on March 10, 2008, someone purporting to be the customer called the Customer Contact Center and ordered a replacement card for the account. The replacement card was requested to be sent to a new address located on xxxx xx[th] Street,

NW, Washington, D.C. 20011. The bank identified four ATM withdrawals and eight

check card purchases fraudulently made by suspect Smith. On March 12, 2008, two ATM withdrawals posted to the account in the amount of $603 and $403. Surveillance footage taken from the Kenyon Square, Washington, D.C., location identified Smith. On March 13, 2008, two more ATM withdrawals posted in the amount of $603 and $403. Surveillance footage taken from the Kenyon Square, Washington, D.C., location identified an unknown suspect. Additionally, the following check card transactions were posted on the account:

| 03/12/08 at 7:17 p.m.  | Ledo Pizza in Washington D.C. | $17.26 |
| 03/12/08 at 10:34a.m. | Exxon Mobile Store # 47 in Washington D.C. | $75.00 |
| 03/12/08 at 9:37 p.m.  | Exxon Mobile Store # 4 in Hyattsville, MD | $48.88 |
| 03/12/08 at 6:27 p.m.  | Old Navy Store # 6119 in Wheaton, MD | $62.50 |
| 03/13/08 at 7:52 a.m.  | McDonalds Store # F695 in Washington D.C | $10.52 |
| 03/13/08 at 7:54 a.m.  | McDonalds Store # F695 in Washington D.C. | $3.62 |
| 03/13/08 at 10:04 a.m. | Exxon Mobile Store # 47 in Washington D.C. | $38.01 |
| 03/13/08 at 7:30 a.m.  | Exxon Mobile Store # 47 in Washington D.C. | $3.34 |

Mr. Haimanot Gedamu advised Chevy Chase Bank that he did not make these purchases or withdrawals, nor did he authorize the issuance or use of the card. The total loss on his account was $2,271.13.

### III.    Seizure of Equipment and Data

19.    The aforementioned facts demonstrate probable cause to believe that xxxx xx[th], has been and is being used to commit federal criminal offenses, including violations of Title 18, United States Code, § 1344, and that the items listed in Attachment B, constituting evidence of those violations will be located there. Based on my experience and information that I have obtained from others experienced in such investigations, this evidence will include various pieces of computer hardware, computer software, computer storage media, and computer records. I know that when an individual uses a computer to generate fraudulent documents, such as on-line credit applications, the computer will generally serve both as an instrumentality for committing the crime, and also as a storage

7

device for evidence of the crime. The computer is an instrumentality of the crime because

it is "used as a means of committing [the] criminal offense" as reference in the Federal Rules of Criminal Procedure 41(b)(3). The computers are also likely to be a storage device for evidence of crime because individuals involved in such schemes intentionally or inadvertently maintain records and evidence relating to their crimes on the computers. As such, the evidence obtained during the requested search may provide vital details regarding the files accessed from the computer, copies of personal identification created by the suspects as part of their scheme.

20.     Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices. I have also learned that, even though computer files regarding the fraudulent scheme may be deleted by the subjects or others, the computer system that was previously used to store those files often retains evidence of the offense. This is because files deleted by the user may still remain (in whole or in part) on the storage media, as deletion of a file may not remove that data completely from the media. I also know that during the search of the premises it is rarely possible to complete on-site examination of computer equipment and storage devices for a number of reasons, including the following:

a.     Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is rarely possible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.     The best practices for analysis of computer systems and storage media rely on rigorous procedures designed to maintain the integrity of the evidence

8

and to recover hidden, mislabeled, deceptively-named, erased,

compressed, encrypted, or password-protected data while reducing the likelihood of inadvertent or intentional loss or modification of data. A controlled environment, such as a law enforcement laboratory, is typically required to conduct such an analysis properly.

c.    The volume of the data stored on many computers systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. The hard drive commonly included in desktop computers are capable of storing millions of pages of text.

d.    The ability to encrypt data also can complicate the mere mirroring of hard drives on site, since recreating the data may require the exact same hardware set-up to function properly. It is, therefore, often necessary to re-connect all the original hardware and software in a controlled computer laboratory setting in order to retrieve the relevant evidence and data accurately.

21.    Due to the volume of data at issue and the technical requirements set forth above, it may be necessary that the above-referenced equipment, software, data, and related instructions be seized and subsequently processed by a qualified computer specialist in a laboratory setting. Under the appropriate circumstances, some types of computer equipment may be more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal from the premises. One factor used in determining whether to analyze a computer on-site or to remove it from the premises is whether the computer constitutes an instrumentality of an offense and is thus subject to immediate seizure as such or whether it serves as a mere repository for evidence of a criminal offense. Another determining factor is whether, as a repository for evidence, a particular device can be more readily, quickly, and thus less intrusively, analyzed off-site, with due consideration given to preserving the integrity of the evidence. This, in turn, is often dependent upon the amount of data and number of discrete file areas that must be

9

analyzed, and this is frequently dependent upon the particular type of computer hardware

involved. As a result, it is ordinarily impossible to appropriately analyze such material without removing it from the location where it is seized.

22.    Based upon my knowledge, and training, as well as information related to me by agents and others involved in forensic examination of computers, I am aware that searches and seizures of evidence from computers taken from the premises commonly require agents to seize most or all of the computer system's input/output and peripheral devices. This is done so that qualified computer experts can accurately retrieve the system's data in a laboratory or other controlled environment. Therefore, in those instances where computers are removed from the premises, in order to fully retrieve data from a computer system, investigators must seize all the storage devices, as well as the central processing units (CPU's), and applicable keyboards and monitors which are integral part of the processing unit. If, after inspecting the input/output devices, system software, and pertinent computer-related documentation, it becomes apparent that these items are no longer necessary to retrieve and preserve the data evidence, and are not otherwise seize able, such material and/or equipment will be returned within a reasonable time.

## IV.    Analysis of Electronic Data

22.    The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file directories and the individual files that they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence authorized for seizure by the warrant): examining all the structured, unstructured, deleted, and overwritten data on a particular piece of media; opening or reading the first few pages of such files in order to determine their contents; scanning storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic keyword searches through all electronic storage areas to determine whether

10

occurrences of such language contained in the storage areas are intimately related to the

subject of the investigation.

**V.**    **Request for Search Warrant**

23.    Based upon what I have witnessed in this particular investigation, what I have learned about Arevalo, and my knowledge of bank fraud, it is common for suspects to store the evidence, fruits and/or instrumentalities of their crimes within their homes and vehicles. Therefore, I respectfully submit that there is probable cause to believe that evidence, fruits and/or instrumentalities of bank fraud, in violation of 18 U.S.C. § 1344, will be found in  Arevalo's home at xxxx xx[th] Street, NW, Washington, D. C. 20011.

Pedro Tavares

Special Agent

United States Secret Service

Sworn to and subscribed before me this _____ day of April, 2008

_____

United States Magistrate Judge

District of Columbia

11

**ATTACHMENT A**

## ATTACHMENT A

## LOCATION TO BE SEARCHED

The government is requesting authority to search the residential property located at xxxx xx[th] Street, NW, Washington, D.C., for items described in Attachment B, which items constitute evidence, contraband, fruits, or instrumentalities of violations of the federal laws.

The location at xxxx xx[th] Street, NW, and the corner of Allison Street, NW, Washington, D.C., is more fully described as a two story brown brick row house. The entrance to xxxx xx[th] Street is located on the Western side. The front porch is constructed of concrete and brick staircase that runs across the front of the building providing access to the street with two statutes of the Virgin Mary placed on the steps. The home is marked with black numbers "xxxx" affixed to the left entryway column, clearly visible from the street. The entry is separated by a iron decorated storm door.

Included in the search for the items described is a shed attached to the Southwestern side of the home and a dog house located in the backyard.

## ATTACHMENT B

## ITEMS TO BE SEARCHED AND SEIZED

Evidence and proceeds relating to identity theft including, but not limited to, the following:

RECORDS/DOCUMENTS/MATERIALS

A.)    Search the premises for any evidence relating to identity theft as described in this application and seize any assets related to credit card fraud and identity theft, and;

B)    Search and seize records, documents, and materials containing information of past and present criminal activity relating to the aforementioned criminal activity.  The terms "records," "documents," and "materials" includes records in all forms, such as those on paper, in any photographic form, in any mechanical form including, but not limited to, any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as tape recordings, cassettes, as well as printouts or readouts from any magnetic storage device), and any form that is stored in electronic or magnetic form on hard drives, compact disks, zip disks, magnetic tapes or floppy disks, and;

C)    Seize any applications for credit, check cashing privileges, supermarket cards or similar applications not in the lawful possession of the occupant, and;

D)    Seize any financial instrument such as checks, money orders, wire transfers, credit cards, or other similar devices not lawfully in the possession of the occupant, and;

E)    Seize any documents belonging to or relating to any bank or credit card company, their customers, their vendors, or similar suppliers of bank property, and;

F)    Search and seize any ledgers, books, records, correspondence, applications, facsimile transmissions, notes or receipts relating to expenditures to include the acquisition, conversion, movement, transfer, and disbursement of monies, funds, and financial instruments.

G)    Search and seize bank statements, deposit slips, canceled checks and related records, credit cards, gift cards, money drafts, letters of credit, wire transfers, money orders and cashier's checks and receipts, treasurer's checks, bills of sale, installment contracts, real estate records, passbooks, bank checks, safe deposit

13

box contracts and keys, money wrappers, and any other items evidencing the obtaining, secreting, transferring, concealment, and/or expenditure of illegal proceeds.

H) Search and seize addresses and/or telephone books, rolodex indices, and any papers reflecting names, addresses, telephone numbers, pager numbers, and fax numbers of financial institutions, and other individuals or businesses with whom a financial relationship exists.

I) Search title and lien records, purchase or lease agreements.

J) Seize any and all fruits, instrumentalities, and evidence of crimes related to identity theft to include but not limited to any and all identification documents and/or records.

K) Seize any items purchased with a credit card not lawfully in the possession of the occupant to include, but not limited to, electronics, cellular telephones, and gift cards.

L) Open and search any safes, boxes, bags, compartments, or things in the nature thereof, locked or otherwise, found in said vehicle;

M) Seize all computers, monitors, keyboards, printers, cables, modems, software, hardware, instruction manuals, password documents, encryption and password codes and other computer equipment and accessories, and their stored information, and to remove said computer equipment from its location for a thorough examination at a controlled site when a search warrant is obtained, and;

N) Seize, open, and search all evidence, namely: mail, records, receipts, notes, ledgers, and other papers relating to financial crime and hidden assets, to include: bank statements, checks, checkbooks, deposit slips, money drafts, letters of credit, wire transfers, money orders, cashiers checks, pass books birth certificates and any other forms of identification, and any other items evidencing the secreting, transfer, concealment and expenditure of money;

O) Seize Social Security Administration documents, including Social Security Cards and/or applications for Social Security Cards that appear to be related to individuals other then the residents, and;

P) Seize all cell phones, pagers, telephone  records and bills that might evidence phone calls to and from co-conspirators banks/victims, and seize any of these records that might be pertinent to this investigation, and;

14

Q)      Examine all telephone books, both personal and commercially printed,
        particularly if the books are marked in any fashion which suggests that calls were
        made to associates, and seize  any such books that appear to be pertinent to this
        investigation, and;

R)      Seize any receipts or other documents of any sort that appear to be related to the
        initial purchase, subsequent trade or resale of any stocks, bonds, mutual funds,
        annuities, insurance policies and/or goods unlawfully purchased with monies
        obtained via this fraudulent scheme, and;

S)      Examine any fax machines, caller ID terminals, pagers, printers, scanners,
        embossing machines, encoding machines, typewriters, manual or electronic
        equipment or components, i.e. Personal Computers, used to print and store
        information, and seize any such items that appear to be pertinent to this
        investigation, and;

T)      Seize travel records, including but not limited to, passports, visas, airline tickets,
        boarding passes, and  airline ticket receipts, and;

U)      Seize United States currency in large denominations, and;

V)      Seize photographs that are pertinent to this investigation.